IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| ALEXSAM, INC., a Texas corporation, | ) Civil Action No. 2:13-cv-00002-MHS-CMC |
| | ) |
| Plaintiff, | ) The Honorable Michael H. Schneider |
| | ) |
| v. | ) Magistrate Judge Caroline M. Craven |
| | ) |
| BEST BUY STORES LP, a Virginia limited | ) **ANSWER OF PLAINTIFF, ALEXSAM, INC., TO** |
| partnership, | ) **DEFENDANT BEST BUY STORES, L.P.'S** |
| | ) **THIRD AMENDED ANSWER, DEFENSES,** |
| Defendant. | ) **AND COUNTERCLAIMS** |
| | ) **TO PLAINTIFF ALEXSAM, INC.'S SECOND** |
| | ) **AMENDED COMPLAINT** |
| | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |

Plaintiff, Alexsam, Inc. ("Alexsam"), submits the following response to the counterclaims of

Defendants-Counterclaimant, Best Buy Stores, L.P. ("Best Buy") set forth in its Third Amended

Answer, Defenses, and Counterclaims to Plaintiff Alexsam, Inc.'s Second Amended Complaint

(Dkt. No. 9)[1]:

## COUNTERCLAIMS

1.      This is an action for a declaratory judgment, together with such further relief as may
be necessary or proper, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and
2202. There is an actual controversy between Best Buy and Alexsam arising under the United States
patent laws, Title 35 of the United States Code.

Response:      Alexsam admits that Best Buy's counterclaim purports to be an action for a

declaratory judgment and that there is an actual controversy between Best Buy and Alexsam arising

under the United States patent laws.

---

[1] On June 1, 2010, the Court dismissed, without prejudice, all claims Alexsam asserted against Best Buy Co., Inc.,
and all claims asserted by Best Buy Co., Inc., in its counterclaim for declaratory judgment against Alexsam. (D.I.
43).

2.      Subject matter jurisdiction of this Court is founded on Title 28, United States Code §§ 1331, 1338(a), 2201, and 2202. Venue within this judicial district is proper under Title 28, United States Code §§ 1391(b) or (c).

Response:      Alexsam admits that this Court has subject matter jurisdiction over Best Buy's counterclaims and that venue is proper in the Eastern District of Texas.

3.      Best Buy Stores, L.P. is a Virginia limited partnership with its principal place of business in Minnesota.

Response:      Alexsam admits that Best Buy Stores, L.P. is a Virginia limited partnership with its principal place of business in Minnesota.

4.      Alexsam alleges that it is a corporation organized and existing under the laws of the State of Texas.

Response:      Alexsam admits that it is a corporation organized and existing under the laws of the State of Texas.

5.      Alexsam purports to own U.S. Patent No. 6,000,608 ("the '608 patent") and U.S. Patent No. 6,189,787 ("the '787 Patent").

Response:      Alexsam admits that it owns U.S. Patent No. 6,000,608 ("the '608 patent") and U.S. Patent No. 6,189,787 ("the '787 Patent").

### FIRST COUNTERCLAIM

**(Declaratory Judgment of Non-Infringement of the Asserted Patents)**

6.      Best Buy restates and realleges each of the allegations set forth in Counterclaim paragraphs 1 through 5 above.

Response:      Alexsam admits that Best Buy restates and realleges each of the allegations set forth in Counterclaim paragraphs 1 through 5 above.  Alexsam restates and realleges each of its responses to paragraphs 1 through 5 above.

7.      Alexsam alleges that Best Buy has infringed the '608 patent and the '787 patent, subjecting Best Buy to liability under the patent laws of the United States.

<u>Response</u>:        Alexsam admits that it alleges that Best Buy has infringed the '608 patent and

the '787 patent, subjecting Best Buy to liability under the patent laws of the United States.

8.        Best Buy denies these allegations. Best Buy has not infringed and does not infringe—
not directly, indirectly, contributorily, and/or by inducement—any valid claim of the '608 patent or
the '787 patent, literally or under the doctrine of equivalents.

<u>Response</u>:        Denied.

9.        An actual case or controversy exists between Alexsam and Best Buy as to whether
Best Buy infringes any valid claim of the '608 patent or the '787 patent.

<u>Response</u>:        Admitted.

10.        Best Buy is entitled to judgment declaring that it has not infringed and does not
infringe any valid claim of the '608 patent or the '787 patent as alleged by Alexsam.

<u>Response</u>:        Denied.

### SECOND COUNTERCLAIM

### (Declaratory Judgment of Invalidity of the Asserted Patents)

11.        Best Buy restates and realleges each of the allegations set forth in Counterclaim
paragraphs 1 through 10 above.

<u>Response</u>:        Alexsam admits that Best Buy restates and realleges each of the allegations

set forth in Counterclaim paragraphs 1 through 10 above.  Alexsam restates and realleges each of its

responses to paragraphs 1 through 10 above.

12.        Alexsam alleges that Best Buy has infringed valid claims of the '608 patent and the
'787 patent.

<u>Response</u>:        Admitted.

13.        Best Buy denies these allegations and furthermore alleges that each of the claims of
the '608 patent and the '787 patent are invalid for failure to meet the conditions of patentability
and/or otherwise comply with one or more of 35 U.S.C. §§ 100 et seq., 101, 102, 103, and/or 112,
including without limitation under § 102(b) as anticipated by Robert Dorf's offer to sell the system
claimed in the '608 patent to numerous entities, including at least Sprint, MCI, and LinkUSA, more
than one year prior to the July 10, 1997 filing date of the '608 patent.  For example, Mr. Dorf offered
to sell a multifunction card system, the ICS system, to LinkUSA in the spring of 1996, before July
10, 1996, that "has all the elements you wish to use for prepaid card activation, in place." (Ex. A,

RD161241.)  The ICS system that Mr. Dorf offered to sell included all elements of the claims of the '608 patent and '787 patent.  For instance, the ICS system Mr. Dorf was selling "allows for activating through existing POS terminals" and "for recharge through these POS terminals." (*Id.*)  The ICS system Mr. Dorf offered for sale prior to July 10, 1996 also included the use of a BIN, which Mr. Dorf received on March 18, 1996. (*See, e.g.*, Ex. B, RD11693 (receiving BIN); Ex. C, RD160996–999 (first noting that the concepts disclosed within the document were "reviewed with MCI . . . when our first confidentiality agreements [sic] was signed" and then disclosing the use of a "'BIN' number as part of the encoding" for cards in the ICS system); Ex. D, RD161143 (December 7, 1995 fax from Mr. Dorf to MCI enclosing mutual confidentiality agreement); Ex. E, RD161042–44 (February 29, 1996 sales proposal from Mr. Dorf to MCI noting that "the individual mag stripe prepaid card is read much the same way that Visa cards are read").)

> Response:     Denied.

14.     An actual case or controversy exists between Alexsam and Best Buy as to whether the '608 patent and the '787 patent are valid.

> Response:     Admitted.

15.     Best Buy is entitled to judgment declaring that the claims of the '608 patent and the '787 patent are invalid.

> Response:     Denied.

### THIRD COUNTERCLAIM

### (Declaratory Judgment of Res Judicata and/or Collateral Estoppel)

16.     Best Buy restates and realleges each of the allegations set forth in Counterclaim paragraphs 1 through 15 above.

> Response:     Alexsam admits that Best Buy restates and realleges each of the allegations set forth in Counterclaim paragraphs 1 through 15 above.  Alexsam restates and realleges each of its responses to paragraphs 1 through 15 above.

17.     In a prior litigation in this Court, Civil Action No. 2:03-CV-337 (TJW) ("the 337 Action), Alexsam claimed infringement of the '608 and '787 patents, and claimed that American Express Travel Related Services Company, Inc. ("American Express"), "alone or in conjunction with others, has committed acts of infringement in this District." (Dkt. 51 at Paragraph 18.)

> Response:     Admitted.

18.     In the 337 Action, Alexsam further claimed that American Express "either alone or in junction with others, ha[s] in the past and continue[s] to infringe, contribute to infringement, and/or induce infringement of the '608 and '787 patents." (*Id*. at Paragraph 22.)

Response:     Admitted.

19.     During the 337 Action, Alexsam was made aware that American Express provided prepaid cards of the type accused of infringement to Best Buy, for Best Buy to sell to its customers.

Response:     Denied.

20.     American Express continued to provide prepaid cards of the type accused of infringement in the 337 Action to Best Buy, for Best Buy to sell to its customers, until mid-2008. At no time did American Express provide prepaid cards to Best Buy other than of the type accused of infringement in the 337 Action.

Response:     Denied.

21.     On July 1, 2005, Judge T. John Ward of this Court dismissed all claims in the 337 Action against American Express, with prejudice. (Dkt 221.)

Response:     Admitted.

22.     This dismissal with prejudice included and fully adjudicated Alexsam's claims that American Express infringed "alone," infringed "in conjunction with others," contributorily infringed by providing a prepaid card that had no substantial non-infringing use, and/or induced infringement by others. (*Id*. ("Each claim made by Alexsam against American Express in this action is hereby dismissed with prejudice pursuant to Fed. R. Civ. P. 41.").)

Response:     Alexsam admits that the July 1, 2005 Order dismissed Alexsam's claims

against American Express for its infringing activities at that time. Alexsam denies the remaining

allegations of Paragraph 22 of Best Buy's Counterclaims.

23.     Judge Ward's July 1, 2005 dismissal of the 337 Action, with prejudice, extinguished any right that Alexsam had to subsequently accused the sale or use of prepaid cards provided by American Express of the type at issue in the 337 Action of direct, joint, contributory or induced infringement, and extinguished any right to include such prepaid cards provided to Best Buy, for Best Buy to sell to its customers, in this action.

Response:     Denied.

24.     An actual case or controversy exists between Alexsam and Best Buy as to whether any claim or allegation in this action against any Best Buy prepaid card provided by American Express is barred by res judicata and/or collateral estoppel.

Response:     Denied.

25.     Best Buy is entitled to judgment declaring that any claim or allegation in this action directed to a Best Buy prepaid card provided by, distributed by, or processed by American Express is barred by res judicata and/or collateral estoppel.

Response:     Denied.

## FOURTH COUNTERCLAIM

### (Declaratory Judgment of Res Judicata and/or Collateral Estoppel)

26.     Best Buy restates and realleges each of the allegations set forth in Counterclaim paragraphs 1 through 25 above.

Response:     Alexsam admits that Best Buy restates and realleges each of the allegations set forth in Counterclaim paragraphs 1 through 25 above.  Alexsam restates and realleges each of its responses to paragraphs 1 through 25 above.

27.     Certain of the accused Best Buy cards are distributed by InComm.

Response:     Denied.

28.     In a prior litigation in this Court, Civil Action No. 2:03-CV-337 (TJW) ("the 337 Action), Alexsam claimed infringement of the '608 and '787 patents, and claimed that InComm, "alone or in conjunction with others, has committed acts of infringement in this District." (Dkt. 51 at Paragraph 18.)

Response:     Denied.

29.     In the 337 Action, Alexsam further claimed that InComm "either alone or in conjunction with others, ha[s] in the past and continue[s] to infringe, contribute to infringement, and/or induce infringement of the '608 and/or '787 patents." (*Id*. at Paragraph 22.)

Response:     Denied.

30.     During the 337 Action, Alexsam accused InComm of infringing the '608 and '787 patents through use of the same system that InComm uses today to process the accused Best Buy cards.

Response:     Denied.

31.     On July 11, 2005, Alexsam and InComm entered into a Compromise and Settlement Agreement and Release of All Claims ("Settlement Agreement"), through which Alexsam released "InComm, its officers, directors, employees, agents, affiliates, and customers … from any and all claims and/or counterclaims that were or could have been brought in the Lawsuit for infringement of the '608 and/or '787 patents."

Response:     Alexsam is without knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 31 and therefore denies them.

32.     On July 20, 2005, Alexsam and InComm submitted a Stipulation and Order of Dismissal with Prejudice to the Court in which Alexsam represented that, based on the parties' Settlement Agreement, "each claim made or that could have been made by Alexsam against InComm… in this action is hereby dismissed with prejudice" (Dkt. 233).

Response:     Denied.

33.     On July 25, 2005, the Honorable T. John Ward of this Court granted the Stipulation and Order of Dismissal and dismissed with prejudice "each claim made or that could have been made by Alexsam against InComm." (Dkt. 234.)

Response:     Denied.

34.     The Settlement Agreement and dismissal with prejudice included and fully adjudicated Alexsam's claims that InComm infringed "alone," infringed "in conjunction with others," contributorily infringed the '608 and '787 patents. (*Id.* ("[T]he Stipulation and Order of Dismissal is GRANTED and [] each claim made or that could have been made by Alexsam against InComm…is hereby dismissed with prejudice.").)

Response:     Alexsam is without knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 34, and it is also unintelligible, and therefore Alexsam

denies them.

35.     Judge Ward's July 1, 2005 dismissal of the 337 Action with prejudice accordingly extinguished any right by Alexsam to subsequently accuse the same system for processing prepaid cards at issue in the 337 Action of direct, joint, contributory or induced infringement, and extinguished any right to include such prepaid cards provided to or by Best Buy in this action.

Response:     Denied.

36.     An actual case or controversy exists between Alexsam and Best Buy as to whether any claim or allegation in this action against any Best Buy prepaid card provided by, distributed by, or processed by InComm is barred by res judicata and/or collateral estoppel.

Response:      Denied.

37.     Best Buy is entitled to judgment declaring that any claim or allegation in this action directed to a Best Buy prepaid card provided by, distributed by, or processed by InComm is barred by res judicata and/or collateral estoppel.

Response:      Denied.

## FIFTH COUNTERCLAIM

### (Declaratory Judgment of Collateral Estoppel and/or Res Judicata)

38.     Best Buy restates and realleges each of the allegations set forth in Counterclaim paragraphs 1 through 37 above.

Response:      Alexsam admits that Best Buy restates and realleges each of the allegations

set forth in Counterclaim paragraphs 1 through 37 above.  Alexsam restates and realleges each of its

responses to paragraphs 1 through 37 above.

39.     Alexsam and InComm are parties to a License Agreement covering the activation of "any Non-Reloadable Card distributed by or through InComm that is activated by using an Open Network and a POS Device, and is, either alone or in combinations with the acts or equipment of others, covered by a claim of [the '608 or '787 patents] as those claims have been construed by T. John Ward."

Response:      Denied.

40.     The License Agreement contains a provision providing for arbitration between the parties, and that, should arbitration ensue, "[t]he finding of the arbitrator shall be final and binding on all parties."

Response:      Denied.

41.     On January 30, 2008, Alexsam gave InComm formal written notice of a dispute pursuant to the License Agreement.

Response:      Alexsam is without knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 41 and therefore denies them.

8

42.     On May 31, 2008, Alexsam made a formal demand for arbitration, and the parties appointed Karl Bayer, an arbitrator located in Austin, Texas, to resolve the dispute.

Response:     Alexsam is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and therefore denies them.

43.     The arbitration concerned whether InComm's activation of certain stored value cards – including Best Buy stored value cards – fell within the scope of the License Agreement (and by extension, within the scope of the '608 and '787 patent claims).

Response:     Denied.

44.     Following the close of discovery, InComm moved for partial summary judgment seeking judgment that, *inter alia*, (i) activation transactions originating from dedicated terminals are not within the scope of the '608 and '787 patent claims; and (ii) activation of stored value cards encoded with a serial number (as opposed to a BIN) do not fall within the scope of the '608 and '787 patent claims.

Response:     Alexsam is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and therefore denies them.

45.     Alexsam responded to InComm's motion, conceding that the activation of stored value cards through dedicated terminals are not covered by the License Agreement, but contesting that the activation of stored value cards encoded with serial numbers are not covered by the claims of the '608 and '787 patents.

Response:     Alexsam is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and therefore denies them.

46.     On March 30, 2011 – after an initial opinion and further briefing by the parties – the arbitrator issued judgment on InComm's motion for partial summary judgment, holding that the activation of stored value cards through dedicated terminals and the activation of stored value cards encoded with a serial number (as opposed to a BIN) do not fall within the scope of the '608 and '787 patent claims.

Response:     Alexsam is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and therefore denies them.

47.     Following an arbitration hearing on the remaining issues in the case, InComm petitioned the United States District Court for the Western District of Texas, Austin Division, on

December 9, 2011 to confirm the March 30, 2011 order. (*See Interactive Communications International, Inc. v. Alexsam, Inc*., Case No. 1:11-cv-01056, Dkt. 1.)

Response:    Alexsam is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and therefore denies them.

48.    Alexsam did not contest this petition. (Dkt. 9.)

Response:    Alexsam is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and therefore denies them.

49.    On February 3, 2012, an Order and Final Judgment was entered in the Western District of Texas in favor of InComm and against Alexsam confirming the arbitrator's March 30, 2011 award. (Dkt. 10 and 11.)

Response:    Alexsam is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and therefore denies them.

50.    The March 30, 2011 arbitration award and subsequent February 3, 2012 Order and Final Judgment by the Western District of Texas are final and binding judgments against Alexsam that fully adjudicate any claims by Alexsam that the '608 and '787 patents cover the activation of (i) any stored value products activated through a dedicated terminal and/or (ii) any stored value cards encoded with a serial number (as opposed to a BIN).

Response:    Alexsam is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and therefore denies them.

51.    The March 30, 2011 arbitration award and subsequent February 3, 2012 Order and Final Judgment by the Western District of Texas moreover extinguished any right that Alexsam had to subsequently accuse the activation of prepaid cards through a dedicated terminal or encoded with a serial number as infringing the '608 or '787 patents.

Response:    Alexsam is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and therefore denies them.

52.    An actual case or controversy exists between Alexsam and Best Buy as to whether any claim or allegation in this action against any Best Buy prepaid card activated over a dedicated terminal or encoded with a serial number is barred by res judicata and/or collateral estoppel.

Response:    Denied.

53.     Best Buy is entitled to judgment declaring that any allegation in this action directed to a Best Buy prepaid card activated over a dedicated terminal or encoded with a serial number is barred by res judicata and/or collateral estoppel.

Response:     Denied.

## SIXTH COUNTERCLAIM

### (Declaratory Judgment of Unenforceability)

54.     Best Buy restates and realleges each of the allegations set forth in Counterclaim paragraphs 1 through 53 above.

Response:     Alexsam restates and realleges each of its responses to paragraphs 1 through

53 above.

55.     Prior to about 1995 Robert Dorf had little experience with processing payment transactions other than as a clothing retailer. Around the beginning of 1995, Mr. Dorf began to assist a company called WorldDial in marketing prepaid cards. WorldDial had prior experience regarding processing card transactions and was working on development of systems and methods for activating multifunction cards through multifunction card systems. Mr. Dorf had no prior experience or skills in the development and processing of electronic transactions. He inquired from WorldDial and learned how it activated prepaid cards through its own proprietary methods and systems. (*See, e.g.*, Ex. F, RD17376.)

Response:     Denied.

56.     By around December 1996, Mr. Dorf adopted a plan to appropriate WorldDial's ideas and to claim them as his own. This plan began at least by December 31, 1996, when Mr. Dorf falsely claimed that he gave "code" and other confidential proprietary information to WorldDial and demanded its return. (Ex. G, BBYRealSource0000442–43.) However, Mr. Dorf conceded the falsity of that statement when he admitted through attorneys on August 2, 2012 that he "never gave any code to WorldDial." (Ex. H, 8/2/12 Richards Email to Harting.) This plan to appropriate WorldDial's ideas and extract money from other parties continued from 1997 through the present.

Response:     Denied.

57.     In furtherance of the above plan, Mr. Dorf filed U.S. Patent Application Serial No. 08/891,261 ("the '261 application") with the USPTO on July 10, 1997. The '261 application listed Robert Dorf as its inventor. On December 14, 1999, the '261 application issued as U.S. Patent No. 6,000,608 ("the '608 patent").

Response:     Alexsam admits that Mr. Dorf filed U.S. Patent Application Serial No.

08/891,261 ("the '261 application") with the USPTO on July 10, 1997 listing Robert Dorf as its

inventor.  Alexsam further admits that on December 14, 1999, the '261 application issued as U.S.

Patent No. 6,000,608 ("the '608 patent").  Alexsam denies that Mr. Dorf filed the '261 application in

furtherance of any alleged "above plan" and all other remaining allegations.

58.    On October 27, 1999, U.S. Patent Application Serial No. 09/428,641 ("the '641 application") was filed with the USPTO.  The '641 application listed Robert Dorf as its inventor.  On February 20, 2001, the '641 application issued as U.S. Patent No. 6,189,787 ("the '787 patent").

<u>Response</u>:    Alexsam admits that on October 27, 1999, U.S. Patent Application Serial No.

09/428,641 ("the '641 application") was filed with the USPTO listing Robert Dorf as its inventor.

Alexsam further admits that on February 20, 2001, the '641 application issued as U.S. Patent No.

6,189,787 ("the '787 patent").

59.    In procuring both the '608 and '787 patents, Mr. Dorf misrepresented in both patent applications that a serious disadvantage existed in the prior art because the prior art required single-function dedicated hardware to be installed in each retail location, resulting in a very inflexible and expensive system, and that there was a need for an activation system that allowed cards to be purchased in varying amounts and to be recharged without requiring the use of a "closed system" to handle the transaction, which he expressly defined as using a "dedicated activation terminal."

a)    That statement was false and misleading because the prior art WorldDial system combined the activation of gift cards and phone cards with standard, retail point-of-sale devices such as the well known and widely used Verifone Trans 330 point-of-sale device.

b)    Mr. Dorf knew that the above statement was false because he was personally involved in offering, selling, and installing the WorldDial activation functionality which he also knew used standard, retail point-of-sale devices for activating cards. WorldDial representatives Carrol "Buzz"Bennett and Leslie Andrew Speck told him, before July 10, 1997, that the WorldDial system for activating gift cards included software that was downloaded on standard, retail point-of-sale devices. For example, Mr. Bennett told Mr. Dorf, in a May 19, 1996 fax, to determine the manufacturers and model number of a point-of-sale terminal and memory location on standard terminals for downloading the software for gift card applications, and he disclosed the use of Visa protocols for gift card transactions. A copy of the May 19, 1996 fax is attached hereto as Exhibit I. (*See also, e.g.*, Ex. T, Bennett Dep. Tr. at 85:19–86:3; Ex. U, Speck Dep. Tr. at 110:16–111:13; Ex. V, Barclay Dep. Tr. at 138:17–143:14, 144:16–20).) Thus, Mr. Dorf knew at the time he made the above misstatement that the prior art did not "require single-function dedicated hardware to be installed in each retail location, resulting in a very inflexible and expensive system."

c)      Mr. Dorf intended that the above misstatements include the WorldDial prior art. Mr. Dorf testified in subsequent proceedings that WorldDial and a patent issued to Stimson, which he did disclose, were "identical." (Ex. J, RD147754 at 780; *see also* Ex. K, RD147814 at 832 ("The World Dial system was a closed loop system. It's also described in one of their patents that you looked at from Stimson . . .). Mr. Dorf echoed this testimony when he testified during his deposition in the *Pier 1* litigation that "Stimson is another example. WorldDial did the same thing, so they were working on some closed systems." (Ex. L, RD111019 at 031.) However, the WorldDial and Stimson systems were not identical because, as Mr. Dorf knew, the WorldDial system and methods did not "require single function dedicated hardware to be installed in each retail location."

Response:      Alexsam denies the allegations in paragraph 59 and its subparts.

60.      On July 22, 2010, a request to reexamine the '787 patent was filed in U.S. Reexamination Control No. 90/009,789 ("the '789 reexamination"). The request for '789 reexamination was granted on September 21, 2010.

Response:      Admitted.

61.      On August 2, 2010, a request to reexamine the '608 patent was filed in U.S. Reexamination Control No. 90/009,793 ("the '793 reexamination"). The request for '793 reexamination was granted on September 21, 2010.

Response:      Admitted.

62.      On June 6, 2011, the USPTO issued a non-final rejection in the '789 reexamination.

Response:      Alexsam admits that on June 6, 2011, the Examiner in the '789 reexamination issued a non-final rejection as to certain of the claims that were subject to reexamination.  Alexsam denies the remaining allegations of paragraph 62 of Best Buy's Counterclaims.

63.      On June 7, 2011, the USPTO issued a non-final rejection in the '793 reexamination.

Response:      Alexsam admits that on June 7, 2011, the Examiner in the '793 reexamination issued a non-final rejection as to certain of the claims that were subject to reexamination.  Alexsam denies the remaining allegations of paragraph 63 of Best Buy's Counterclaims.

64.      Knowing full well that both of his patents were in jeopardy, Mr. Dorf submitted a Declaration of Robert E. Dorf Under 37 C.F.R. § 1.132 ("Dorf Declaration") on September 6, 2011

in the '789 reexamination and in the '793 reexamination. A copy of the Dorf Declaration is attached hereto as Exhibit M.

      a)     `Mr. Dorf declared in the Dorf Declaration that all statements made therein of his own knowledge were true, that willful false statements and the like so made are punishable by fine or imprisonment or both, and that such willful false statements may jeopardize the validity or enforceability of the application or any patent issued thereon. Mr. Dorf knew the importance of being truthful.

<u>Response</u>:     Alexsam admits that Mr. Dorf submitted the Dorf Declaration on September 6, 2011 in the '789 reexamination and in the '793 reexamination.  Alexsam further admits that Mr. Dorf declared in the Dorf Declaration that all statements made therein of his own knowledge were true, that willful false statements and the like so made are punishable by fine or imprisonment or both, and that such willful false statements may jeopardize the validity or enforceability of the application or any patent issued thereon.  Alexsam denies the remaining allegations contained in paragraph 64 and its subpart.

      65.    Mr. Dorf misrepresented in the Dorf Declaration that "using [the WorldDial] system, a dedicated activation terminal was provided," and that "WorldDial's dedicated activation terminals could not transmit data related to other types of cards; only data for its own phone cards." (Ex. M, ¶ 4.)

      a)     That statement was unmistakably false and misleading because WorldDial combined the activation of gift cards and phone cards with standard, retail point-of-sale devices such as the well known and widely used Trans 330 point-of-sale device offered by Verifone.

      b)     Mr. Dorf knew that the above statement was false and misleading because he was personally involved in offering, selling, and installing the WorldDial activation functionality which used standard, retail point-of-sale devices for activating cards. Mr. Bennett told Mr. Dorf, in a May 19, 1996 fax at 5 p.m., that the World Dial system could be loaded into memory locations of existing models of point-of-sale terminals which also used VISA protocols. (*See* Ex. I.)

      c)     Sworn testimony of WorldDial officer and co-owner Carrol "Buzz" Bennett, taken at pages 85–98 of his June 13, 2012 deposition, establishes that Exhibit I was given to Mr. Dorf so that he would have information in order to activate at point-of-sale, and that the WorldDial activation functionality ran "parallel" to other programming on Verifone devices. (Ex. T, at 85–98.) Among other things, when asked what Mr. Bennett meant by

characterizing the WorldDial activation program as a "parallel program," Mr. Bennett testified at pages 84–85:

> Q. Would you tell me what you meant by a parallel program, please?
> A. The parallel would run along with all of the other programs that were in the Verifone. So, if – if a retailer was using a – was using a Verifone point of sale, the – the program would come to them if they were using – if they were accepting Visa or if they're accepting MasterCard, Discover and American Express – I think were the most popular ones at the time – and – and the Verifone would have to be programmed so that when you swiped an American Express card or a Visa Card or whatever, the Verifone would identify the card and route it through the proper channel. In order for it to take our system and run it into our platform, we would have to put a parallel program in the Verifone that would – now you'd have five programs in the Verifone instead of four.

Mr. Bennett's testimony, corroborated by Exhibit J, establishes that Mr. Dorf was personally offering, selling and installing WorldDial activation functionality that operated in parallel with other programs on Verifone terminals, so that the WorldDial system and methods did not require "dedicated" terminals as Mr. Dorf told the USPTO.

d)      Mr. Dorf further knew that the above statement was false and misleading because, as memorialized in a July 26, 1995, 11:37 a.m. status report from Mr. Bennett to Mr. Dorf, World Dial was interfacing "EGC programming," or electronic gift certificate card programming (the same term used in this patent claims) with a Verifone terminal. A copy of the July 26, 1995 status report is attached hereto as Exhibit N.

e)      Mr. Dorf further knew that the above statement was false and misleading because as of at least July 26, 1995, Mr. Dorf and WorldDial were offering a point-of-sale activation system and method to a customer called Nelson's, which included downloads of EGC programming from either Verifone or VisaNet onto existing Verifone terminals. (*See* Ex. N.)

f)      Mr. Dorf further knew that the above statement was false and misleading because he also knew that as of July 26, 1995, WorldDial had ordered about 30 standard $50 Verifone terminals to install in customer locations for point-of-sale activations, all as confirmed in the July 26, 1995 status report from Mr. Bennett to Mr. Dorf. (*See* Ex. N.)

g)      Leslie Andrew Speck was an officer and co-owner of WorldDial, who had personal knowledge of the WorldDial system and methods of activating cards. He testified on June 20, 2012, pages 110–19, that the above statement, and other statements cited below, were not true. (Ex. U, Speck Dep. Tr. at 110–19.)

<u>Response</u>:      Alexsam denies the allegations in paragraph 65 and its subparts.

66.    Mr. Dorf further fabricated the problem allegedly solved by his invention, and misrepresented in the Dorf Declaration that WorldDial's "dedicated" terminals presented a "stumbling block to gaining acceptance by both retailers and phone card carriers," and that "[r]etailers were reluctant to implement a card program that required them to deploy another piece of hardware that would occupy more counter space and would be usable for only that one purpose and required use of a telephone line that was not readily available." (Ex. M, ¶ 7.)

a)    That statement was false and misleading because there was no such "stumbling block" and no need for a dedicated terminal to activate gift cards or phone cards. WorldDial combined the activation of gift cards and phone cards with standard, retail point-of-sale devices such as the well known and widely used Verifone Trans 330 point-of-sale device, so that retailers were not "required . . . to deploy another piece of hardware . . . ."

b) Mr. Dorf knew that the above statement was false and misleading for at least the reasons set forth in paragraphs 65(a)–(f).

Response:    Alexsam denies the allegations in paragraph 66 and its subparts.

67.    Mr. Dorf further misrepresented that WorldDial and the prior art had "inherent limitations" that required dedicated activation terminals and that there was a "lack of alternative system configurations" for the gift card applications. (Ex. M, ¶ 7.) He emphasized that major retailers such as "LDDS, WorldCom, Sprint, MCI and AT&T" wanted to overcome the inherent limitation in using the alleged "dedicated activation terminals." (*Id.*)

a)    That statement was false and misleading because there was no such "inherent limitation," and there were alternative system configurations to achieve the same objective, including WorldDial's system and method of downloading software and using a blank register in the existing standard retail point-of-sale terminals.

b) Mr. Dorf knew that the above statement was false and misleading for at least the reasons set forth in paragraphs 65(a)–(f).

Response:    Alexsam denies the allegations in paragraph 67 and its subparts.

68.    Mr. Dorf further misrepresented that he conceived the idea of "associat[ing] a unique identification number with each phone debit card and including a BIN with the identification number," and that he invented a system that "initiates card transactions from standard retail POS devices and routes transactions over a network to a processing hub used to authorize the transactions." (Ex. M, ¶¶ 8, 13.)

a)    Those statements were false and misleading because WorldDial had practiced that idea first and explained it to Mr. Dorf before he applied for either of his patents.

b)    Mr. Dorf knew that the above statements were false and misleading because, at least by May 19, 1996, Mr. Bennett communicated the use of VISA protocols to Mr. Dorf, who knew that access to the VISA networks required use of a BIN. (*See* Exs. I, N.)

c)      Mr. Dorf further knew that the above statement was false because he was personally involved in efforts to sell a WorldDial point-of-sale activation system and method to GTE, which included BINs, prior to applying for either patent. (*See, e.g.*, Ex. O, BBYRealSource0014710; Ex. P, BBYRealSource0015084–86.) Mr. Dorf knew how the WorldDial system and methods activated gift cards when he tried to sell them to GTE.

d)      Mr. Dorf further knew that the above statement was false because he was personally involved in efforts to sell a WorldDial point-of-sale activation system and method to MCI, which included BINs, prior to applying for either patent. For example, RD160996–99 (Ex. C), a fax sent from Mr. Dorf to MCI, discloses the use of a "'BIN' number as part of the encoding" for multifunction cards that Mr. Dorf offered for sale to MCI, and notes that the concepts disclosed in the fax were "reviewed with MCI . . . when our first confidentiality agreement[] was signed." RD161143 (Ex. D), another fax from Mr. Dorf to MCI, attached the confidentiality agreement as of December 7, 1995, and thus establishes that the exchange of such information between Mr. Dorf and MCI occurred well before Mr. Dorf applied for either patent, and at a time when Mr. Dorf was actively selling WorldDial's system to MCI. (*See, e.g.*, Ex. Q, BBYRealSource0014849 (showing that Mr. Dorf was still selling WorldDial's system to MCI in May 1996).)

Response:      Alexsam denies the allegations in paragraph 68 and its subparts.

69.      Mr. Dorf further misrepresented that "[a]mong other successful implementations of my invention, and apart from those business that have taken licenses under the '608 and '787 patents, I developed POS activation systems based on my inventions for The Pantry, a convenience store chain with stores in the southeastern United States, in conjunction with a company called ILD." (Ex. M, ¶ 14.)

a)      The above statement is false and misleading, and Mr. Dorf knew that the above statement was false and misleading because, as Mr. Dorf testified during his deposition on October 9, 2012, ILD never sold a single card through Mr. Dorf's system. (*See* Ex. S, Dorf Dep. Tr. of 10/9/12, Vol. 1, at 249:14–16; 254:10–256:23.) Mr. Dorf's deposition testimony that no cards were sold establishes that Mr. Dorf's system for ILD and The Panty was not a "successful implementation" of his alleged invention.

b)      In addition, the above statement is false and misleading, and Mr. Dorf knew that the above statement was false and misleading because, as Mr. Dorf testified during his deposition on October 9, 2012, Mr. Dorf never did any processing for ILD. (Ex. S, at 254:19– 23.) Mr. Dorf's testimony that he did not do any processing further establishes that Mr. Dorf's system for ILD and The Panty was not a "successful implementation" of his alleged invention.

c)      Mr. Dorf knew the above statement was false and misleading because he was personally involved with the system for ILD and The Pantry, as set forth in his  October 9, 2012 testimony. (Ex. S, at 249:14–16; 254:10–256:23.)

Response:      Alexsam denies the allegations in paragraph 69 and its subparts.

70.    Mr. Dorf also caused the Declaration of Robert Baker ("Baker Declaration") to be filed with the USPTO in conjunction with and on the same date as the Dorf Declaration. A copy of the Baker Declaration is attached hereto as Exhibit R. In the Baker Declaration, Mr. Baker addressed secondary considerations to overcome any determination that Mr. Dorf's patents were obvious. Mr. Baker echoed many of Mr. Dorf's false and misleading statements described above.

a)    The Baker Declaration falsely stated that the patents resolved a long felt need because of the "inflexibility associated with requiring single-function dedicated hardware terminals to be installed in each retail location to implement the system," when in fact single function dedicated hardware terminals were not "required" by the prior art. (Ex. R, ¶ 91.)

b)    The Baker Declaration further falsely described the prior art by stating that "[e]ach retailer was required to have dedicated terminals for each issuer's cards" (*id.*) when in fact the WorldDial system combined gift card activation technology with pre-existing, standard point-of-sale devices. Thus, each retailer clearly was not required to have dedicated terminals.

c)    The Baker Declaration further falsely stated that "prior approaches . . . failed to recognize the potential for greatly expanding the market for these products through the use of a more cost effective, secure and scalable technology for facilitating card activations and recharges using existing point of sale technology . . ." when WorldDial had clearly used existing point-of-sale technology for the same systems and methods. (*Id.*, ¶ 95.)

Response:      Alexsam admits that the Baker Declaration was filed with the USPTO on

September 6, 2011 and that in the declaration Mr. Baker addressed secondary considerations of non-

obviousness.  Alexsam denies the remaining allegations in paragraph 70 and its subparts.

71.    The Dorf Declaration and the above described misstatements were unmistakably false and made with a deliberate, planned, and carefully executed scheme to defraud and deceive the USPTO. The continuing, repeated nature of the material misstatements, all of which are belied by documented communications of which Mr. Dorf was a party and corroborated by three witnesses from WorldDial who have no interest in this case, coupled with the fact that the misstatements were directed at issues that Mr. Dorf knew would affect patentability, coupled with the fact that he repeated the same misstatements about WorldDial's purported need for "dedicated terminals" in subsequent litigation, can lead to no other conclusion.

Response:      Denied.

72.    The above false and misleading statements were relied upon by the USPTO to distinguish the claims of the '608 patent and '787 patent from the prior art. Furthermore, the USPTO relied upon the misstatements in evaluating secondary considerations for nonobviousness and in allowing the patents after reexamination.

Response:     Denied.

73.     Based on his personal involvement and experience marketing the WorldDial system and methods for activating phone and gift cards with standard, pre-existing point-of-sale technology, supported by written communications such as those described above, Mr. Dorf unquestionably knew the falsity of the material misrepresentations described above. Thus, the above-described material misrepresentations were made with a specific intent to deceive the USPTO in an effort to obtain issuance, and subsequent confirmation, of the '608 and '787 patents.

Response:     Denied.

74.     But for the above described false and misleading statements to the USPTO, the '608 patent and the '787 patent would not have issued, and the patents would not have been confirmed after reexamination.

Response:     Denied.

75.     Best Buy is entitled to a judicial declaration that the claims of the '608 and '787 patents are invalid and unenforceable.

Response:     Denied.

### PRAYER FOR RELIEF

WHEREFORE, Alexsam prays for judgment and requests that this Court:

(a) Dismiss Best Buy's counterclaims with prejudice;

(b) Enter judgment in favor of Alexsam;

(c) Award Alexsam its reasonable costs, expenses, and attorneys' fees; and

(d) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Date:    January 24, 2013                  /s/ Alison Aubry Richards
                                          Timothy P. Maloney (IL 6216483)
                                          Alison Aubry Richards (IL 6285669)
                                          Nicole L. Little (IL 6297047)
                                          David A. Gosse (IL 6299892)
                                          FITCH, EVEN, TABIN & FLANNERY
                                          120 South LaSalle Street, Suite 1600
                                          Chicago, Illinois 60603
                                          Telephone: (312) 577-7000
                                          Facsimile: (312) 577-7007

                                          Melissa Richards Smith
                                          Texas State Bar No. 24001351
                                          Melissa@gillamsmithlaw.com
                                          GILLAM & SMITH, L.L.P.
                                          303 South Washington Avenue
                                          Marshall, TX  75670
                                          Telephone: (903) 934-8450
                                          Facsimile: (903) 934-9257

                                          Steven C. Schroer (IL 6250991)
                                          scschr@fitcheven.com
                                          FITCH, EVEN, TABIN & FLANNERY
                                          1942 Broadway
                                          Suite 213
                                          Boulder, CO 80302
                                          Telephone: 303.402.6966
                                          Facsimile: 303.402.6970

                                          *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this the 24th day of January, 2013.  Any other counsel of record will be served by first class mail.

/s/ Alison Aubry Richards
Alison Aubry Richards
*Attorney for Plaintiff, Alexsam, Inc.*