# United States District Court
### EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **ALEXSAM, INC.** <br> v. | |
| **BEST BUY STORES LP** | Cause No. 2:13-cv-2 <br> **LEAD CASE FOR INVALIDITY** |
| **BARNES & NOBLE, INC. AND BARNES & NOBLE MARKETING SERVICES, LLC** | Cause No. 2:13-cv-3 |
| **THE GAP INC. AND DIRECT CONSUMER SERVICES, LLC** | Cause No. 2:13-cv-4 |
| **J.C. PENNEY COMPANY, INC. AND J.C. PENNEY CORPORATION** | Cause No. 2:13-cv-5 |
| **MCDONALD'S CORPORATION AND P2W, INC. NFP** | Cause No. 2:13-cv-6 |
| **TOYS "R" US—DELAWARE, INC. AND TRU-SVC, LLC** | Cause No. 2:13-cv-7 |
| **THE HOME DEPOT, U.S.A., INC. AND HOME DEPOT INCENTIVES, INC.** | Cause No. 2:13-cv-8 |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING INEQUITABLE CONDUCT**

Plaintiff filed this action against Defendants alleging patent infringement of U.S. Patent Nos. 6,000,608 and 6,189,787. The Court consolidated the case for invalidity purposes. But the Court severed Defendants' inequitable conduct claim for a separate bench trial. The Court conducted a consolidated jury trial on Defendants' remaining invalidity claims, and the jury rendered a verdict finding none of the asserted claims invalid as anticipated. The jury also found neither patent invalid for failing to name all of the inventors. Thereafter, the Court conducted a bench trial on Defendants' inequitable conduct claim.

Having considered the parties' stipulations, the pleadings, the testimony and credibility of the witnesses, the evidence and exhibits, the arguments and briefs of counsel, and the applicable law, the Court finds no inequitable conduct during the reexamination of the patents.

## I. BACKGROUND

This litigation involves alleged patent infringement of two patents: U.S. Patent Nos. 6,000,608 (the '608 patent) and 6,189,787 (the '787 patent). In general, the technology covers card activation systems. Plaintiff accuses Defendants' gift card activation systems of infringing these patents. In response, Defendants maintain the patents are invalid. In part, Defendants argue that Plaintiff engaged in inequitable conduct before the U.S. Patent and Trademark Office (PTO) during reexamination.

Defendants argue that inventor Robert Dorf and technical expert Robert Baker filed unmistakably false declarations to overcome an obviousness rejection during reexamination. Therefore, Defendants conclude an inequitable conduct finding is warranted.

At the time of the inequitable conduct bench trial, the parties raised two legal and factual issues for resolution. First, whether Mr. Dorf's declaration during the reexamination constituted inequitable conduct. And second, whether Mr. Baker's declaration during the reexamination constituted inequitable conduct. The Court reaches the following conclusions on these issues:

1) Mr. Dorf did not engage in inequitable conduct before the PTO during the reexamination of the patents; and

2) Mr. Baker did not engage in inequitable conduct before the PTO during the reexamination of the patents.

These issues are more fully addressed in the findings of fact and conclusions of law set forth below.[1] The findings are limited to the relevant factual disputes raised.[2]

## II.     FINDINGS OF FACT

1. The facts set forth in the background section—whether disputed or undisputed—are found by the Court to be true by a preponderance of the evidence.

### A. The Asserted Patents

2. The '608 patent issued on December 14, 1999, from Application No. 08/891,261 (the '261 application). The '261 application was filed July 10, 1997.

3. The '787 patent issued on February 20, 2011, from Application No. 09/428,641 (the '641 application). The '641 application was a continuation of the '261 application. The '641 application was filed on October 27, 1999.

4. Mr. Dorf is the sole named inventor on both the '608 and '787 patents.

5. The patents relate to stored value cards programs, such as electronic gift card programs. The patents generally provide systems and methods for performing card activation using retail point-of-sale (POS) devices, intermediate networks and processors, and card processing hub platforms.

6. The patents were assigned to Alexsam, Inc. on September 23, 2003.

### B. Prior Systems

7. Prior to Mr. Dorf's invention, there were other available systems for activating prepaid cards. Examples include a system for activating prepaid cards that used a dedicated single function terminal which would only activate a specific card issuer's card.

---

[1] Any finding of fact more properly characterized as a conclusion of law is adopted as such. Any conclusion of law more properly characterized as a finding of fact is adopted as such.

[2] For purposes of this order, the Court only considered relevant and admissible evidence.

8. Another example of a preexisting system is a system that used reprogramed POS terminals.

9. Both patents list U.S. Patent No. 5,577,109 to Stimson et al. (Stimson) as a cited reference.

10. Stimson discloses a closed pre-paid card system.

11. Closed card activation systems include both the use of dedicated activation terminals and reprogrammed terminals. Reprogrammed terminals include split dialing configurations.

12. A standard terminal, such as a Verifone Trans 330, is sold with empty registers for the purpose of adding custom software.

13. A split dialer configuration involves parallel processing. In this configuration, software is downloaded on to a standard terminal's available register. As a result, the same terminal can then activate a specific card issuer's prepaid card and continue to process credit or debit card transactions.

14. The specification of the '608 patent describes Stimson as follows:

> In the Stimson system, the cards are not preactivated. Each of the retail locations from which cards are to be sold is provided with a dedicated activation terminal which allows the retail operator to set the value of the card at the time of the sale. The activation terminal connects to the card issuer's system to pass along the value amount and to request activation of the card. Depleted cards can be recharged in the same manner as they are sold. A serious disadvantage of the Stimson system is that it requires single-function dedicated hardware to be installed in each retail location, resulting in a very inflexible and expensive system.

'608 Patent, 2:3–14.

15. The specification of Stimson also explains that:

> If the customer desires to pay using a credit card which itself needs to be verified, the data terminal may also be used for this purpose. It should be further noted that the data terminals 14 may be

> implemented in existing payment terminals such as credit card, ATM or money order machines, and these existing payment terminals may be modified to accept other forms of payment.

'109 Patent, 6:14–19.

### C. Prosecution History

16. During prosecution of the '608 patent, Mr. Dorf made the PTO examiner aware that "Stimson teaches the utilization of custom software at a point of sale location for activating prepaid phone cards" (June 24, 1999, Amendment and Response, Case No. 2:13-cv-2, Doc. No. 23-4 at 14).

17. Mr. Dorf additionally explained that "Stimson teaches the use of customized software requiring modification of existing point of sale devices." (June 24, 1999, Amendment and Response, Case No. 2:13-cv-2, Doc. No. 23-4 at 14).

18. During prosecution, Mr. Dorf differentiated his invention by explaining that:

> [E]xisting point-of-sale devices known in the art for processing credit card and/or debit card transactions can be utilized without modification. This is of great benefit over the systems of the prior art since no additional programming is required in the device at the point of sale. This additional programming is required so that the point of sale device can reach network devices outside the banking network. The prior art necessity for custom programming at the point of sale suffers from the disadvantage of additional overhead, additional expense and programming, and the possibility, if not the likelihood that such custom programming could be corrupted or rendered obsolete by the overarching standards imposed by the financial processing institution which controls the use of point-of-sale devices in a banking network.

June 24, 1999, Amendment and Response, Case No. 2:13-cv-2, Doc. No. 23-4 at 12–13.

19. To contrast with the dedicated terminal or reprogramming solutions in the prior art, the claims of the '608 patent require "unmodified existing standard retail point-of-sale device" ('608 Patent, 11:49–50).

20. The card activation system developed by a company called WorldDial was never raised as prior art during the original prosecution of the patents.

### D. Reexamination Proceedings

21. On July 22, 2010, a request for ex parte reexamination of the '787 patent was filed. The PTO ordered reexamination of the '787 patent on September 21, 2010. The reexamination was assigned Control No. 90/009,789 ('789 reexamination).

22. On July 23, 2010, a request for ex parte reexamination of the '608 patent was filed. The PTO order reexamination of the '608 patent on September 21, 2010. The reexamination was assigned Control No. 90/009,793 ('793 reexamination).

23. On June 6, 2011, the PTO issued a non-final office action in the '789 reexamination rejecting certain claims.

24. On June 7, 2011, the PTO issued a non-final office action in the '793 reexamination rejecting certain claims.

#### i. Mr. Dorf's Reexamination Declaration

25. In September 2011, Mr. Dorf submitted a declaration, under oath, in opposition to the non-final office actions pursuant to 37 C.F.R. § 1.132 in the '789 and '793 reexaminations.

26. In his declaration, Mr. Dorf raised the WorldDial system to explain the state of the art at the time of his invention.

27. Importantly, the WorldDial system was never asserted as prior art during the reexaminations.

28. Specifically, Mr. Dorf stated that:

> 4. In the mid-1990's, I became involved with a prepaid phone card technology provider called WorldDial. WorldDial was one of the

> first providers of a system for activating prepaid phone cards at a retailer's location at the time of purchase. *Using this system, a dedicated activation terminal was provided*. Non-active cards were shipped to a retailer and the retailer could display the cards in the non-active state, avoiding the likelihood of theft of usable cards. After selling a card, retailers could activate the cards at the dedicated activation terminal installed at each retail location by WorldDial. Activation data was sent to the WorldDial host computer, which would activate the cards. *WoldDial's dedicated activation terminals could not transmit data related to other types of cards; only data for its own phone cards*.
>
> 5. WoldDial's activation system was what is called a "closed system." The system contained one card issuer, WorldDial, a specialized dedicated activation terminal, and the WorldDial host computer. Activation data was sent directly from the terminal to their host. At the time I first became involved, WorldDial had installed its closed phone card system in several prisons, at post offices in Alaska, and in some smaller retailers. *At that time, there were no systems for activating cards from multiple prepaid card issuers using equipment already present at retail locations*.

Dorf Declaration, Case No. 2:13-cv-2, Doc. No. 23-7 at ¶¶4–5 (emphasis added).

29. Defendants contend Mr. Dorf's statements are false. Specifically, Defendants argue that the WorldDial system did not require a dedicated activation terminal. According to Defendants, WorldDial was also activating cards using a split dialer configuration.

30. The use of a split dialer configuration was known prior to Mr. Dorf's invention.

31. Mr. Dorf understood that the only system WorldDial ever demonstrated used a dedicated terminal.

32. Additionally, Mr. Dorf was never aware of WorldDial ever using a split dialer configuration or ever downloading software onto any retailer's existing POS devices.

33. To the extent Mr. Dorf created inaccurate marketing materials on WorldDial's behalf, he was doing so based on inaccurate information he received from other WorldDial employees, including Leslie Speck and Carrol Bennett.

34. Defendants provide no corroborating evidence that WorldDial ever actually implemented a split dialer configuration.

35. Defendants provide no corroborating evidence that WorldDial ever created or actually implemented a system that reprogrammed a retailer's existing POS device.

36. Defendants provide no corroborating evidence that WorldDial ever used a terminal to transmit data related to both its own prepaid cards and data related to other types of cards (i.e. credit or debit cards).

37. In his declaration, Mr. Dorf further noted that:

> Among other *successful* implementations of my invention, and apart from those businesses that have taken licenses under the '608 and '787 patents, I developed POS activation systems based on my inventions for The Pantry, a convenience store chain with stores in the southeastern United States, in conjunction with a phone card company called ILD.

Dorf Declaration, Case No. 2:13-cv-2, Doc. No. 23-7 at ¶14 (emphasis added).

38. Mr. Dorf considered his implementation with The Pantry successful in the technical sense because the invention worked for its intended purpose.

39. Mr. Dorf testified that they were able to perform a complete transaction and fully tested the system. Although they did not activate any cards, Mr. Dorf testified that they activated an account associated with the card.

40. In performing a complete transaction, Mr. Dorf considered the implementation with The Pantry a success.

### ii. Mr. Baker's Reexamination Declaration

41. In September 2011, Alexsam's technical expert Mr. Baker, submitted a declaration, under oath, in opposition to the non-final office actions pursuant to 37 C.F.R. § 1.132 in the '789 and '793 reexaminations.

42. In his declration, Mr. Baker addressed preexisting card system technology.

43. Specifically, Mr. Baker explained that:

> To limit phone card theft, systems were developed for activating phone cards after they had been purchased. *These systems relied upon dedicated terminals and/or terminals that had been specially programmed specifically for use in the phone card activation system*. These dedicated terminals used proprietary card encoding to send activation requests directly from the terminal to the phone card company host computer rather than sending the transactions to a credit or debit card processor. To sell the cards, merchants had to purchase or lease the terminal and/or special terminal software associated with a given phone card provider. These systems are what can be referred to as "closed systems."

Baker Declaration, Case No. 2:13-cv-2, Doc. No. 23-8 at ¶23 (emphasis added).

44. Mr. Barker additionally highlighted in his declaration that:

> Retailers were reluctant to incur the high expense and inflexibility associated with requiring *single-function dedicated hardware terminals* to be installed in each retail location at each, of potentially many, checkout locations to implement the system, or to *reprogram existing terminals* to communicate activation transactions to the card issuer's proprietary system.

Baker Declaration, Case No. 2:13-cv-2, Doc. No. 23-8 at ¶24 (emphasis added).

### *iii. Resolution of Reexaminations*

45. On July 10, 2012, the PTO issued a reexamination certificate for the '608 patent.

46. On July 24, 2012, the PTO issued a reexamination certificate for the '787 patent.

47. The reexamination certificates confirmed the patentability of nearly all of the claims.

### III. CONCLUSIONS OF LAW

#### A. Jurisdiction

1. The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338(a).

2. Venue is proper in the Eastern District of Texas under 28 U.S.C. § 1391(b).

3. Because this action arises under the patent laws, Federal Circuit precedent is controlling. *See* 28 U.S.C. § 1295(a)(1).

   **B. <u>Burden of Proof</u>**

4. An issued patent carries a strong presumption of validity. *See* 35 U.S.C. § 282(a).

5. A party contesting a patent's validity based upon inequitable conduct bears the burden of proving that claim by clear and convincing evidence. *See In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 519 (Fed. Cir. 2012).

   **C. <u>Inequitable Conduct</u>**

6. "Inequitable conduct has been overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system. The habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011) (en banc) (quotations omitted).

7. "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Id.* at 1285.

8. Generally, invalidity defenses invalidate individual patent claims. But inequitable conduct renders the entire patent unenforceable and can impact the enforceability of related patents or applications. *See id.* at 1288. Thus, inequitable conduct is commonly referred to as the "atomic bomb" of patent law. *Id.*

9. To establish inequitable conduct, "the challenger must show by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *Rosuvastatin*, 703 F.3d at 519.

10. Materiality and intent are separate and distinct requirements. *Id.*

11. Materiality is demonstrated where "the PTO would not have allowed the claim but for the nondisclosure or misrepresentation." *Id.*

12. An exception to the "but for" standard exists where there is affirmative egregious misconduct. "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material." *Therasense*, 649 F.3d at 1292.

13. "In other words, a false affidavit or declaration is per se material." *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1294 (Fed. Cir. 2012).

14. To establish intent, the challenger must show "the patentee acted with the specific intent to deceive the PTO." *Therasense*, 649 F.3d at 1290.

15. "A district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, or vice versa." *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 651 F.3d 1318, 1334 (Fed. Cir. 2011).

16. "A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." *Therasense*, 649 F.3d at 1290.

17. "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995).

18. Consequently, "[p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Therasense*, 649 F.3d at 1290.

19. "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.*

20. To satisfy the evidentiary burden, "the specific intent to deceive must be 'the single most reasonably inference able to be drawn from the evidence.'" *Id.* (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)).

21. "Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in the light of all the circumstance.'" *Id.* (quoting *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 873 (Fed Cir. 1988) (en banc)).

22. "Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290–91.

### i. *Material Misrepresentation*

23. Defendants have not carried their burden of proving by clear and convincing evidence that either Mr. Dorf or Mr. Baker submitted unmistakably false declarations during the reexamination proceedings.

24. The Court is unconvinced that WorldDial ever actually developed or implemented a system using a split dialing configuration.

25. The evidence establishes that WorldDial only ever developed a system using dedicated activation terminals limited to activating their own cards.

26. Furthermore, Mr. Dorf accurately disclosed the state of the art prior to the reexamination.

27. Mr. Dorf's statements related to the capabilities of the WorldDial system are not unmistakably false or a material misrepresentation.

28. Mr. Dorf's disclosure and explanation of the Stimson reference during prosecution highlights that certain prior art systems required custom programming at POS terminals.

29. Accordingly, the PTO was sufficiently aware of the scope of the prior art during the reexamination proceedings. *See Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1574–75 (Fed. Cir. 1997) (explaining that information that is duplicative or cumulative of other references is not material).

30. Furthermore, Mr. Dorf's statements concerning the success of his invention with The Pantry are not unmistakably false or a material misrepresentation.

31. Mr. Dorf's implementation at The Pantry worked for its intended use. Therefore, it was not inaccurate to describe the implementation as successful.

32. Lastly, Mr. Baker's declaration adequately described the state of the art prior to Mr. Dorf's invention.

33. Mr. Baker correctly explained that prior art systems involved dedicated or reprogrammed terminals.

34. Thus, Mr. Baker's statements were not unmistakably false or a material misrepresentation.

35. The Court does not find that any of the accused statements qualify as material misrepresentations.

### ii. *Specific Intent to Deceive*

36. Even assuming the statements in Mr. Dorf's and Mr. Baker's declarations amount to material misrepresentations, Defendants have not carried their burden of proving by clear and convincing evidence that either Mr. Dorf or Mr. Baker submitted their declarations with the specific intent to mislead or deceive the PTO.

37. At the time of his declaration in 2011, Mr. Dorf was unaware of any WorldDial system implementing a split dialing configuration.

38. Furthermore, Mr. Dorf was unaware of any WorldDial implementation other than the use of dedicated terminals.

39. Based upon the evidence, it is reasonable to infer that Mr. Dorf believed that WorldDial's system was limited to activating its own cards via dedicated terminals.

40. Accordingly, the specific intent to deceive is not the single most reasonable inference drawn from the evidence.

41. Therefore, Mr. Dorf could not have acted with the specific intent to deceive the PTO.

42. Mr. Dorf's statements pertaining to a successful implementation with The Pantry were not made with the specific intent to deceive the PTO.

43. Mr. Dorf genuinely believed that his invention worked for its intended use. Accordingly, Mr. Dorf legitimately believed that this qualified as a successful implementation.

44. Based upon the evidence, it is reasonable to infer that Mr. Dorf believed that his implementation could be characterized as "successful."

45. Therefore, Mr. Dorf's statements regarding his implementation at The Pantry were not made with the specific intent to deceive.

46. As to Mr. Baker's statements, there is no evidence that these statements were made with the specific intent to deceive the PTO.

47. Mr. Baker's statements were consistent with his knowledge and understanding of the prior art. He accurately described the available systems predating Mr. Dorf's invention.

48. Accordingly, the specific intent to deceive is not the single most reasonable inference drawn from the evidence.

49. Based upon the totality of the circumstances, the evidence does not establish deceitful intent as to any statement in Mr. Dorf's or Mr. Baker's declarations.

## IV. CONCLUSION

50. Defendants fail to establish by clear and convincing evidence a material misrepresentation or specific intent to deceive to the PTO.

51. Accordingly, the Court concludes that Defendants fail to prove that the '608 and '787 patents are unenforceable due to inequitable conduct.

**It is SO ORDERED.**

**SIGNED this 1st day of June, 2013.**

_____
MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE